UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| DAISY E. KEESEE, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:10-CV-187 |
| v. | ) | |
| | ) | *Mattice / Lee* |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

Daisy E. Keesee ("Plaintiff") brings this action under 42 U.S.C. § 402(g) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") terminating her disability benefits and denying her new claim for benefits. Specifically, Plaintiff challenges the decision of an Administrative Law Judge ("ALJ") who found that Plaintiff had improved medically and was capable of resuming her past work as an assembler. In the alternative, she seeks a remand to the Commissioner for the consideration of new evidence. Plaintiff has moved for judgment on the pleadings [Doc. 10], and the Commissioner has moved for summary judgment [Doc. 17]. For the reasons stated below, I **RECOMMEND** that this matter be **REMANDED** to the Commissioner pursuant to sentence six of 42 U.S.C. § 405(g).

**I.   BACKGROUND**

Plaintiff, who has a ninth-grade education, had been working as an assembler for a tool manufacturer for 23 years when her second husband died in January 2002 (Tr. 214, 493-94, 497-98). She was awarded disability insurance benefits at that time based on two mental impairments: depression and anxiety (Tr. 14, 16, 41, 215). Her condition, however, was "expected to improve," so the agency reviewed her claim in early 2006 (Tr. 46). During that review, it was determined that

Plaintiff's disability had ended in February 2006 (Tr. 44, 46, 51-64). Plaintiff appealed the termination of benefits (Tr. 66). She also filed a new claim for benefits, which was also denied (Tr. 417-19). She appealed that denial, too, and both appeals were considered together by an ALJ, who found Plaintiff was not disabled and had not been disabled since February 2006 (Tr. 14-21). When the Appeals Council denied Plaintiff's request for review, the ALJ's decision became the final, appealable decision of the Commissioner (Tr. 6).

    **A.    Plaintiff's Mental Health Complaints**

Although Plaintiff was awarded disability benefits based on depression and anxiety when her husband died, her complaints of nervousness and panic attacks predate her husband's death. In 2006, she reported she had received consistent mental health treatment for 17 years, beginning with her mother's death and her first husband's affair (Tr. 304). In 1994, she complained of "panic when I have to drive" and reported that she needed her husband's help to get home (Tr. 147). After that episode, she received treatment for a panic disorder, including a Xanax prescription (Tr. 143, 146).

Plaintiff's mental health provider is William C. Diebold, M.D., whom she first saw in 2000 (Tr. 139, 191). In July 2002, Plaintiff's condition had "retrogressed" (Tr. 191). At that time, Dr. Diebold stated that Plaintiff was afflicted by a panic disorder, severe anxiety, and agoraphobia (Tr. 194). Plaintiff's "debilitating" condition was caused by severe stress associated with her husband's death and her own physical problems (Tr. 191, 195). Dr. Diebold also remarked that Plaintiff was facing a "court battle" after her husband's death, in an apparent reference to Plaintiff's probate dispute with her husband's daughters and ex-wife (Tr. 177, 498). Despite "high dose medication," Dr. Diebold opined, Plaintiff was "for all practical purposes . . . housebound" (Tr. 189, 194). He was unsure whether and when Plaintiff would be able to work again (Tr. 195). Dr. Diebold's

2

treatment notes during this time show that Plaintiff was "shaking" and unable to focus (Tr. 177).

In November 2002, Plaintiff received a consultative mental status exam by Rexford Burnette, Ph.D. (Tr. 213-16). Plaintiff was experiencing "considerable unresolved grief" due to her husband's death (Tr. 214). She described auditory hallucinations and she was tearful during the interview (Tr. 213-15). Based on his examination, Dr. Burnette opined that Plaintiff's memory was not significantly impaired, but she was moderately limited with respect to concentration and persistence and social interaction, and she was moderately to markedly limited in her ability to adapt to day-to-day stresses (Tr. 215-16).

Plaintiff was admitted to Woodridge Hospital in December 2002, for alcohol and Xanax detoxification after she experienced a Grand Mal seizure due to Xanax withdrawals (Tr. 240). Her global assessment of functioning ("GAF") score was 30 on admission and 50 on discharge (Tr. 240).

On April 10, 2003, Rebecca Hansmann, Psy.D., reviewed Plaintiff's file and determined that Plaintiff could not complete regular work hours because of "interruption" from her symptoms of anxiety and depression (Tr. 264). Notably, she opined that Plaintiff was markedly limited with respect to the ability to complete a normal workweek, to interact with the general public, and to respond to changes in the work setting (Tr. 267). The following day, Plaintiff was granted disability benefits retroactive to January 2002 (Tr. 14).

Plaintiff continued to have "situational" stressors (Tr. 187). In 2003, a brother and sister died, and in September 2004, another brother died (Tr. 137, 273). In May 2004, she was again hospitalized for seizures after she stopped taking one of her medications (Tr. 298). Plaintiff reported in November 2004 that her she was "on the outs" with her older son (Tr. 272). In early 2005, she was doing "much better" and was dating again, and in September of that year, she was "doing well"

(Tr. 271). Nonetheless, she continued to be stressed over the probate of her home (Tr. 271). Despite her situational stressors, Dr. Diebold stated in October 2003 that he did not consider Plaintiff to be permanently and totally disabled "for life" (Tr. 187).

Kathy Miller, M.Ed., performed a consultative evaluation in January 2006[1] (Tr. 303-08). In her report, which the ALJ gave great weight, Ms. Miller observed that Plaintiff was socially confident and comfortable and that she generally understood the instructions of the tasks she was given (Tr. 19, 304). However, Plaintiff demonstrated "erratic concentration" (Tr. 304). Overall, Plaintiff appeared "fairly stable on her current medications" (Tr. 306). Ms. Miller concluded that Plaintiff met the diagnostic criteria for "major depression, single episode," which "appear[ed] to have resolved" (Tr. 307). Plaintiff's panic disorder, furthermore, was "mild with medications" (Tr. 307). She noted that Plaintiff reported her most recent panic attack had occurred two weeks prior to the examination (Tr. 307). Based on her examination, Ms. Miller opined that Plaintiff was not significantly limited in understanding or memory, social interaction, or adaptation, but was moderately limited in concentration (Tr. 308).

Shortly thereafter, Rebecca Joslin, Ed.D., Ph.D., reviewed Plaintiff's file and opined she was not limited in memory or understanding and was able, with "some difficulty," to maintain concentration, persistence, and pace, to interact with the public, and to adapt to change (Tr. 327). Another reviewing consultant, Janice Castles, opined that Plaintiff could maintain attention for one- to three-step simple tasks, and she should be given work that does not require constant interaction with the general public (Tr. 336). She further opined that Plaintiff's "infrequent" anxiety attacks

---

[1] Ms. Miller performed her examination under the supervision of Robert Spangler, Ed.D. (Tr. 308), and during the hearing and in the written decision, the ALJ refers to the report as Dr. Spangler's report (e.g., Tr. 19, 505).

4

would not interfere with her ability to complete a normal work week on a regular basis (Tr. 336). The agency informed Plaintiff the next day, February 15, 2006, that her benefits would be terminated (Tr. 44).

Several days later, Dr. Diebold submitted a letter to the agency in which he opined that Plaintiff remained "unable to work at this time" (Tr. 339). Her medications, Dr. Diebold remarked, "can at times keep her stable, but she still has breakthrough panic episodes which result in her not being able to drive herself and keep her confined to her home most of the time." (Tr. 339).

William Regan, M.D., a reviewing consultant, opined in July 2006 that Plaintiff was mildly limited in activities of daily living and social functioning and moderately limited in maintaining concentration, persistence, and pace (Tr. 384). She could perform simple tasks, in his opinion, but would have some difficulty relating to the public and performing detailed tasks (Tr. 390).

### B. Plaintiff's Physical Health Complaints

Plaintiff has also received treatment for various physical ailments. In November 2000, while she was working as an assembler, she complained of "tingling" in her hands (Tr. 173). Her grip strength was 2/5 in the left hand, and she was initially diagnosed with tendonitis in that hand (Tr. 171). She was referred to an orthopedic (Tr. 168), who performed a cubital tunnel release and a carpal tunnel steroid injection in January 2001 (Tr. 203). She continued to have mild carpal tunnel syndrome, which worsened after she stopped working (Tr. 197-198, 248).

By November 2002, one consultative examiner opined she had no physical limitations, despite her complaints that she still experienced numbness in her left hand (Tr. 219). Another examining physician, however, stated in March 2003 that Plaintiff could not perform work involving vigorous pushing or pulling, rapid and repeated motions with her left hand, or extreme flexion or

5

extension of her left wrist (Tr. 248-51). She was also limited to lifting five pounds occasionally (and no amount of weight frequently) with her left hand (Tr. 251). By July 2006, however, Plaintiff's grip strength was rated 5/5 in both hands (Tr. 394).

In December 2002, Plaintiff's orthopedic noted she was tender to palpation at the major trigger points for fibromyalgia, and he recorded his impression as "fibromyalgia and muscular deconditioning" (Tr. 198). In July 2006, Karl Konrad, Ph.D., M.D., performed a consultative examination of Plaintiff (Tr. 393-95). He noted Plaintiff's history of fibromyalgia, but "[t]welve point fibromyalgia testing [was] negative" (Tr. 394). Dr. Konrad also noted Plaintiff's history of seizures, hypertension, diabetes, and respiratory complaints,[2] but he concluded based on his objective findings that Plaintiff had "no impairment-related physical limitations" (Tr. 395). Around that same time, Denise Bell, M.D., a reviewing consultant, opined similarly that Plaintiff had no exertional limitations (Tr. 369).

Shortly after her benefits were terminated, Plaintiff received treatment for intermittent irregularities in her heartbeat (Tr. 347). After some testing (Tr. 348), she received a heart catheterization and radiofrequency ablation (Tr. 397-403).

### C. Plaintiff's Hearing Before the ALJ

Plaintiff appeared for her hearing before the ALJ on June 30, 2008 (Tr. 491). Plaintiff was not represented, so the ALJ conducted a colloquy to determine if Plaintiff wanted to proceed without representation:

ALJ: . . . Do you understand that you have that right [to be represented]?

CLMT: Yes, and my son – I, I tried to get lawyers and –

---

[2] Plaintiff smokes, and she has complained of difficulty breathing (Tr. 406-07).

| | |
|---|---|
| ALJ: | Yes, but I have a duty to advise you that you have that right and to make certain you understand you have that right. |
| CLMT: | Yes, sir. |
| ALJ: | And you're nodding your head, yes? |
| CLMT: | Well, I tried to get a lawyer for this and they said it was too soon, they could not go over the paperwork and everything that quick. Then I was going to get my son, who was going to come with me today . . . . He couldn't come – |
| ALJ: | Is he a lawyer? |
| CLMT: | No. . . . But he works with handicapped people and he's good with people and . . . he got called out of town this morning. |
| ALJ: | Well, it's my understanding that you want to continue today, is that right? |
| CLMT: | Yes, sir. |

(Tr. 491-92). After this exchange, the ALJ took Plaintiff's testimony regarding her past work, her mental health treatment, and her post-termination treatment for tachycardia (Tr. 492-97). The ALJ noted that the record did not contain a report from Dr. Diebold other than the "older one," presumably referring to Dr. Diebold's February 2006 opinion that Plaintiff was disabled and unable to work due to her panic disorder (Tr. 339). Plaintiff protested that she was still receiving treatment from Dr. Diebold, and the ALJ told her he would leave the record open for two weeks so that Plaintiff could submit an "updated report" and an opinion whether Plaintiff could work (Tr. 501, 504). The ALJ clarified that he wanted Plaintiff to submit both Dr. Diebold's more recent treatment notes and an assessment of how Plaintiff's impairments affect her ability to work (Tr. 504-05). Plaintiff said she understood, and she indicated she would be able to submit those reports (Tr. 504-05).

It appears Plaintiff did obtain and submit a single treatment note from Dr. Diebold after the

7

hearing. That note, dated June 18, 2008, about two weeks before the hearing, states that Plaintiff was "very stressed" and "can't focus" (Tr. 416). Plaintiff was not able to drive herself to that appointment (Tr. 416). Dr. Diebold wrote that Plaintiff did not appear to be able to work (Tr. 416). It appears, however, that none of the other treatment notes from June 2006 through the hearing were submitted to the ALJ (*see* Tr. 430-41).

Also at the hearing, the ALJ also took the testimony of a vocational expert ("VE"), who opined that if Plaintiff could perform work at the light and medium exertional levels, with the mental restrictions indicated in Ms. Miller's 2006 assessment, she could work in food preparation assembly, cleaning, dishwashing, and hand packaging (Tr. 502-03).

**D.     The ALJ's Decision**

**1.     Applicable Law**

Once granted, disability benefits may be terminated upon the Commissioner's finding that "there has been any medical improvement in the individual's impairment or combination of impairments . . . related to the individual's ability to work . . . and . . . the individual is now able to engage in substantial gainful activity." 42 U.S.C. § 423(f)(1). There is no presumption of continued disability. 42 U.S.C. § 423(f); 20 C.F.R. § 404.1594(b)(6).

To determine whether the recipient's impairments have "improved," the ALJ must first establish a reference point. That point is known as the comparison point decision ("CPD"), and it is defined as "the most recent favorable medical decision that [the recipient] was disabled or continued to be disabled . . . ." 20 C.F.R. § 404.1594(b)(7). Beginning with that reference point, the ALJ determines whether the recipient's impairments have medically improved. 20 C.F.R. § 404.1594(f)(3). If so, the ALJ must determine whether such improvement is related to the

recipient's ability to work, 20 C.F.R. § 404.1594(f)(5). This requires the ALJ to assess the recipient's current residual functional capacity ("RFC") and compare it to her RFC at the time of the CPD.

If the recipient's ability to work has increased due to her medical improvement, the ALJ proceeds to ask whether the recipient's impairments remain "severe," or in other words, whether they "significantly" affect her ability to perform work. If they are not severe, the recipient's disability has ended. 20 C.F.R. § 404.1594(f)(6). If they are severe, the ALJ asks whether the recipient can still perform work she has done in the past or, failing that, other work. Id. § 404.1594(f)(7), (8).

### 2. ALJ'S Findings

As the ALJ noted, Plaintiff's CPD was the April 2003 decision finding she was disabled due to anxiety and depression (Tr. 41). The ALJ found that Plaintiff's affective and anxiety disorders had improved since that time, and that the improvement was related to her ability to work (Tr. 17-19). Although her mental impairments remained "severe," the ALJ concluded Plaintiff retained the RFC to perform medium exertional work, but she was moderately limited in the area of concentration, persistence, and pace (Tr. 19). Given this RFC, the ALJ relied on the VE's testimony to conclude that Plaintiff's impairments did not prevent her from performing her past work as an assembler (Tr. 20-21). The ALJ found, alternatively, that Plaintiff could perform other work in food preparation, cleaning, dishwashing, stocking, and packing (Tr. 21).

### E. Evidence Submitted to the Appeals Council

Following the ALJ's adverse decision, Plaintiff retained counsel, who argued to the Appeals Council that the ALJ should have taken the initiative to obtain updated records from Dr. Diebold

rather than leaving the task to Plaintiff (Tr. 423). Plaintiff's counsel also argued the ALJ should have obtained records of Plaintiff's treatment for various physical maladies, including cervical disc disease, myelopathy, and Raynaud's disease (Tr. 423). Along with a brief, Plaintiff's counsel submitted her more recent medical records.

Among those records are treatment notes from Dr. Diebold, which show that he continued to treat Plaintiff with medications and supportive therapy between June 2006 and September 2009 (Tr. 430-41). During that time, Plaintiff's condition varied in severity. On some occasions, she was described as "doing fairly well" or "better" (Tr. 433, 438, 440). More often, however, she was described as "doing poorly," "tearful," "very stressed," and "anxious" (Tr. 430, 431, 432, 434, 435, 436, 437, 439). On more than one occasion, Plaintiff was unable to drive to her appointment (Tr. 435, 436).

Dr. Diebold also provided an updated assessment of Plaintiff's ability to perform work-related tasks, dated September 2009 (Tr. 428-29). Dr. Diebold opined that, based on his examination, Plaintiff had no ability to deal with the public, interact with supervisors, deal with work stresses, function independently, maintain attention and concentration, behave in an emotionally stable manner, or relate predictably in social situations (Tr. 428-29). She had a "fair" ability to follow work rules, relate to co-workers, use judgment with the public, understand detailed and complex instructions, and demonstrate reliability (Tr. 428-29). She had a "good" ability to understand and execute simple instructions and to maintain personal appearance(Tr. 429).

Plaintiff's more recent records also contain treatment notes for her physical complaints, but they do not contain any physician's opinion with respect to Plaintiff's work abilities. Plaintiff received a second heart catheterization in May 2008 (Tr. 443-44). She also received treatment

10

related to complaints of hand and foot pain (Tr. 487). John Dorizas, M.D., noted in October 2008 that Plaintiff had trace pulses in her feet and decreased temperature in her hands and feet (Tr. 487). He recorded his assessment as Raynaud's disease, or a "vascular insufficiency" (Tr. 487).

As noted above, the Appeals Council concluded that Plaintiff's new evidence did not provide a basis for changing the ALJ's decision. Plaintiff's next recourse was her appeal to this Court.

## II.     ANALYSIS

Plaintiff brings several challenges. Two are procedural challenges: she contends that she did not validly waive her right to proceed without representation at the hearing and that the ALJ did not fulfill his "special duty" to develop the record for her as an unrepresented claimant. Plaintiff also attacks the substance of the ALJ's findings. Specifically, she contends the ALJ erred by discounting the opinion of her treating physician and by ignoring her physical impairments. Finally, in the alternative, Plaintiff argues that her case should be remanded to the Commissioner for the consideration of new and material evidence.

### A.     Standard of Review

The Commissioner's findings supporting termination or denial of benefits must be affirmed if supported by substantial evidence. 42 U.S.C. §§ 405(g), 423(f)(1). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have

supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971).

The court may consider any evidence in the administrative record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). Evidence submitted after the close of administrative proceedings, however, cannot be considered for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Similarly, where the claimant presents new evidence to the Appeals Council, but the Appeals Council declines to review the ALJ's decision, that new evidence may not be considered during review on the merits. *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993). Instead, the new evidence can be considered only for purposes of remand pursuant to sentence six of 42 U.S.C. § 405(g), which authorizes the court to remand a case for further administrative proceedings "if the claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding." *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).

### B. Plaintiff's Substantive Challenges

Plaintiff's substantive arguments draw from the record before the ALJ and from the evidence submitted to the Appeals Council after the ALJ issued a written decision. As noted above, however, the evidence submitted to the Appeals Council cannot be considered for purposes of substantial evidence review. Based on the record as a whole before the ALJ, I **FIND** the ALJ's decision was supported by substantial evidence.

Plaintiff argues that the ALJ erred in discounting her treating physician's opinion, but to the extent the ALJ failed to adopt Dr. Diebold's opinion, he gave good reasons for doing so. Dr.

Diebold's February 2006 letter, as the ALJ noted, contained a conclusion that Plaintiff was "unable to work at this time," which Plaintiff concedes is a determination reserved to the Commissioner. *See Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 493 (6th Cir. 2010) (holding that a physician's opinion that a claimant cannot work is not, in itself, entitled to any particular weight). A treatment note from 2008 contained a similar conclusion (Tr. 416), but the ALJ rejected it on the same ground. Plaintiff points to Dr. Diebold's opinion that Plaintiff's medications kept her stable, "but she still has breakthrough panic episodes which result in her not being able to drive herself and keep her confined to her home most of the time." (Tr. 339). The ALJ, however, did not reject that portion of Dr. Diebold's opinion. Instead, the ALJ found that "breakthrough panic," otherwise stable with medications, was not a condition "of such severity and frequency as to preclude the performance of sustained work activity" (Tr. 19).

Plaintiff also argues that the ALJ ignored her physical impairments in making his RFC finding. The argument appears to rest primarily on the evidence that Plaintiff submitted to the Appeals Council after the ALJ's decision. To the extent that Plaintiff argues the ALJ did not consider the evidence in the record before him, the assertion is belied by the ALJ's opinion itself. The ALJ acknowledged Plaintiff's treatment for tachycardia, a peripheral arteriovascular disease, and shortness of breath, as well as poor uncorrected eyesight, but found that Plaintiff did not have any "severe" physical impairments, noting that no reviewing or examining physician offered any work limitations related to physical impairments (Tr. 18-19).

### C. Plaintiff's Procedural Challenges

Plaintiff also argues that she did not validly waive her right to counsel at the hearing and that the ALJ did not fulfill his special duty to develop the record for an unrepresented claimant. For the

13

reasons explained below, I do not reach the merits of Plaintiff's procedural challenges.

**D.     Sentence Six Remand**

Plaintiff's procedural arguments are better considered alongside her request for a sentence six remand. To prevail on either of her procedural arguments, Plaintiff must show prejudice. *Adams v. Hecker*, 1986 WL 16517 (6th Cir. 1986) (Table). *See also Kidd v. Comm'r of Soc. Sec.*, 283 F. App'x 336, 344-45 (6th Cir. 2008); *Buchheit v. Weinberger*, 542 F.2d 361 (6th Cir. 1976). Plaintiff offers only one plausible source of prejudice: she claims she was unable, without representation, to obtain and submit her updated medical records and that the ALJ should have obtained those records on her behalf.[3] The absence of those records can be considered prejudicial only if they might have changed the outcome of her case. Similarly, to prevail on her request for sentence six remand, Plaintiff must show that those same records are "material"—i.e., that there is a "reasonable probability that the [ALJ] would have reached a different disposition of the disability claim if presented with the new evidence." *See Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 357). Here, the Commissioner argues only that the evidence is not material. Consequently, if Plaintiff can show prejudice, she will also show she is entitled to a sentence six remand.

**1.     Materiality**

Plaintiff argues the evidence submitted to the Appeals Council is material because it includes "precise limitations" on her work abilities from her treating psychiatrist. The Commissioner

---

[3] Plaintiff also argues in passing that she was prejudiced because she was unable to cross examine the vocational expert, but she provides no authority for the argument. Furthermore, she makes no showing that her disadvantage in this regard was greater than that of any claimant who waived her right to counsel.

responds that the evidence "reveal[s] nothing . . . that was not reflected in earlier treatment records considered by the ALJ." After considering the new evidence, I **FIND** there is a reasonable probability that the ALJ would have assessed Plaintiff's RFC differently if Dr. Diebold's opinion had been available at the time of the decision. In other words, there is a reasonable probability the ALJ would have found the new evidence more persuasive than the older evidence from Dr. Diebold, because the new evidence is not susceptible to the criticisms that the ALJ levied against the older evidence.

The ALJ considered two statements from Dr. Diebold—a short letter dated February 2006 and a comment in a single treatment note dated June 2008 (Tr. 339, 416). Both opinions, in the ALJ's view, suffered from a similar defect: Dr. Diebold did not offer specific work-related functional limitations, but rather opined that Plaintiff was "disabled" or "unable to work" (Tr. 18, 339, 416). According to the ALJ, that decision is "reserved to the Commissioner" (Tr. 18). However, while an ALJ may properly disregard a physician's ultimate conclusion that a claimant is disabled, he may not disregard the physician's *bases* for that opinion. Social Security Ruling 96-5p; *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 493 (6th Cir. 2010). Dr. Diebold's new opinion, which the ALJ did not have the opportunity to review, gives specific functional limitations supporting his conclusion that Plaintiff could not work (Tr. 428-29).

The ALJ also discounted Dr. Diebold's prior opinions because they attributed Plaintiff's inability to drive to her panic disorder. In contrast, the ALJ found that Plaintiff could not drive because she lost her license after driving while impaired (Tr. 18). Even after Plaintiff was able to legally drive again,[4] however, Dr. Diebold's new treatment notes show that Plaintiff was

---

[4] Plaintiff was driving with a breathalyzer ignition lock as early as March 2007 (Tr. 407).

occasionally unable to do so because of her anxiety (Tr. 435, 436).

Finally, the ALJ discounted Dr. Diebold's older opinions in favor of Ms. Miller's assessment (Tr. 19). Explaining his preference, the ALJ noted that "[t]he record simply does not establish panic of such severity and frequency as to preclude the performance of sustained work activity" (Tr. 19). Relatedly, the ALJ found fault with Dr. Diebold's opinions because they were not supported by "contemporaneous treatment notes" (Tr. 18). Dr. Diebold's new opinion, however, is supported by treatment notes for the time period under consideration. Those notes show that Plaintiff continued to suffer from anxiety, albeit with occasional "better" periods, which were of a severity Dr. Diebold believed to be disabling (Tr. 430-41).

While Ms. Miller's assessment found only moderate difficulties in concentration, the ALJ acknowledged at the hearing that Dr. Diebold had treated Plaintiff "a lot more," and indicated that an updated opinion from Dr. Diebold with significant limitations might affect his disposition of Plaintiff's claim (Tr. 505). *See* 20 C.F.R. § 404.1527(d)(2) (noting that treating sources are generally entitled to more weight because a treating physician is likely to be "most able to provide a detailed, longitudinal picture" of a claimant's impairments); *Singleton v. Astrue*, 2011 WL 345840, *6 (E.D. Tenn. 2011) (holding that "the records that accompany [a treating physician's opinion] and [that physician's] long history of treating plaintiff lead the Court to conclude that there is a reasonable probability that the ALJ might have reached a different conclusion if this evidence were before him"). Accordingly, I **FIND** that Dr. Diebold's new opinion, supported by his treatment notes, is material within the meaning of sentence six of 42 U.S.C. 405(g).

A sentence six remand requires, in addition to "material" evidence, that the evidence be "new" and that the claimant show "good cause" for failing to present or obtain it earlier during the

administrative proceedings. 42 U.S.C. § 405(g). As noted above, the Commissioner has argued only that the evidence is not "material" and has therefore waived any argument that the evidence is not new or that Plaintiff lacks good cause. Nonetheless, I **FIND** independently that those criteria are met here, at least with respect to Dr. Diebold's opinion and treatment notes.

### 2. "New" Evidence

Evidence can be considered new only if (1) it is not cumulative of other evidence in the record and (2) it was "not in existence or available to the claimant at the time of the administrative proceeding." *Hensley v. Comm'r of Soc. Sec.*, 214 F. App'x 547, 551 (6th Cir. 2007); *Foster*, 279 F.3d at 357 (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)). For the reasons explained above, Dr. Diebold's opinion and notes are not cumulative of other evidence, but instead provide evidence that the ALJ found lacking. Only the second prong of the test, therefore, is at issue here.

There is no doubt that some of Dr. Diebold's newly-submitted treatment notes were actually in existence at the time of the hearing. Furthermore, the ALJ held the record open for two weeks after the hearing so that Plaintiff could submit those notes, but Plaintiff submitted only one of them (Tr. 416, 436-42). On the other hand, several of the notes, and significantly, Dr. Diebold's new opinion itself, were not in existence until after the record was closed (Tr. 428-35). *See Hale v. Comm'r of Soc. Sec.*, 2011 WL 1641892, *6 (E.D. Mich. 2011) ("Although the 2009 report is based on an MRI from July 2008, it was 'not in existence or available to the claimant at the time of the administrative proceeding,' and is therefore 'new.'").

Furthermore, with respect to the treatment notes dated prior to the hearing, I **FIND** they were not "available" to Plaintiff. Records are not "available" when a claimant acts reasonably and diligently but nonetheless fails to procure them. *See M.R. v. Astrue*, 2009 WL 1139567, *7 (E.D.

17

Tenn. 2009) (holding, based on the assumption that a physician was tardy in responding to the claimant's attorney's requests for records, that the evidence was new); *Cotterman-Henson v. Astrue*, 2010 WL 6052382, *6 (E.D. Tenn. 2010) (records were new where Plaintiff reasonably relied on her doctor's advice regarding when to pursue the course of treatment that ultimately resulted in the proffered evidence).[5]  Here, it appears that Plaintiff attempted after the hearing to procure updated records from Dr. Diebold, but the ALJ received only one additional treatment note.  Given Plaintiff's educational level, limited experience with administrative proceedings, and lack of representation, I cannot find she failed to make reasonable efforts to obtain the evidence.

### 3. Good Cause

Finally, good cause requires more than a showing that evidence was not obtained until after the hearing; instead, the claimant must show a "valid reason" for failing to obtain the evidence prior to the hearing. *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986).  Here, with respect to the treatment notes dated after the hearing, I **FIND** Plaintiff had good cause for failing to obtain them earlier because they were generated in the course of her ongoing treatment.

In addition, with respect to Dr. Diebold's opinion and the pre-hearing treatment notes, it might be argued (though it was not argued by the Commissioner here) that Plaintiff could have obtained the notes and could have asked Dr. Diebold for an assessment of her functional limitations prior to September 2009.  Her failure to do so, however, I **FIND** to be excusable for good cause. It appears that Plaintiff did attempt to supply the ALJ with updated records from Dr. Diebold, but either misunderstood or failed to convey to Dr. Diebold what exactly the ALJ needed.  The ALJ

---

[5] The rule could not be otherwise.  If evidence which could not be procured with reasonable diligence could be considered "available," there would be no work left for the "good cause" requirement.

18

asked Plaintiff to submit her doctor's "assessment [regarding] how [her mental impairments] would affect [her] ability to work." Plaintiff did submit such a document—a treatment note which includes Dr. Diebold's comment that Plaintiff appeared to be unable to work (Tr. 416). Given her lack of representation and level of education, Plaintiff simply cannot be faulted for failing to understand that her submission would be insufficient because it did not contain precise work-related functional limitations. *See Jones v. Sullivan*, 949 F.2d 57, 61 (2d Cir. 1991) (good cause may be shown where a claimant's "*pro se* status . . . hinder[s] the prosecution of her claim"); *Grant v. Astrue*, 2008 WL 4059777, at *5 (S.D. Ohio Aug. 26, 2008) (finding good cause due to "lack of counsel and apparent mental impairment combined with [a] lack of education").

## V. CONCLUSION

For the foregoing reasons, I **RECOMMEND** that:[6]

(1) Plaintiff's motion for judgment on the pleadings [Doc. 10] be **GRANTED** to the extent it seeks a remand to the Commissioner under sentence six of 42 U.S.C. § 405(g).

(2) Defendant's motion for summary judgment [Doc. 17] be **DENIED**.

(3) This matter be **REMANDED** to the Commissioner under sentence six of 42 U.S.C. § 405(g) for further consideration.

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[6] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).